**Bobby Joe JONES, Jr., Appellant**

**v.**

**The STATE of Texas, Appellee**

**NO. 01-15-00358-CR**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued July 21, 2016

Brian Bernard, Tanisa Jeffers, Bernard & Associates, Austin, TX, for Appellant.

Whitney Borgman, Criminal District Attorney, San Marcos, TX, for Appellee.

Panel consists of Justices Keyes, Brown, and Huddle.

## OPINION

Rebeca Huddle, Justice

Appellant Bobby Joe Jones, Jr., was charged by indictment with two counts of aggravated assault with a deadly weapon. The jury found appellant guilty of one count and sentenced him to five years' confinement, with the recommendation that he be placed on community supervision. The trial court sentenced appellant to five years' confinement, probated for ten years. Appellant contends that insufficient evidence supports his conviction and that his trial counsel provided ineffective assistance. We affirm.

### Background

In the summer of 2012, appellant and his teenage son BJ lived with appellant's parents, Bobby Joe Jones, Sr. ("Senior") and Joanie Jones, at the Joneses' residence in Hays County, Texas. At the time, appellant's sister, Ashleigh Jones Dekay, was attempting to reconcile with her ex-husband, Matt DeKay, one of the complainants. Appellant was charged with the offense of aggravated assault with a deadly weapon against Matt and Matt's friend, David Curry, following an incident that occurred in the early morning hours at the Joneses' home. At trial, the jury heard testimony from the complainants, three eyewitnesses and three responding officers.

*Testimony from Complainants*

Matt testified that, up to the time of the offense, he had good relationships with appellant and appellant's parents. Matt and Senior both worked in the construction industry, traveled together, and hunted together. Matt considered Senior a friend, not just a father-in-law.

One late summer evening, Matt, Ashleigh, Joanie, Senior, and others spent hopped among a variety of bars, restaurants, and shops. Matt testified that sometime after dinner, Senior drove himself home, and the rest of the group went to the Stardust in south Austin where they met David and Karen Curry, friends of Matt and Ashleigh. David testified that they arrived at Stardust while it was still light out, around 7:30 p.m. and that he and Matt both had alcohol there. Matt later loaned Joanie his 2011 GMC Sierra crew cab truck, and she drove herself home. Around midnight, David drove Matt to the Joneses' to retrieve his truck.

Matt and David testified that, as they pulled into the driveway, they noticed damage to the truck above the driver's side front tire. The damage resembled a fist mark. Matt testified that he called Joanie to get his keys and talk with her about the damage, but neither Joanie nor Senior knew anything about it. Matt testified that, at the time, he suspected that appellant had damaged the truck by kicking or punching it, and he wanted Senior and Joanie to talk to appellant. David testified that Matt was upset, but not crazy, and that Joanie and Senior were very apologetic. David testified that none of the four had a gun or other weapon and none appeared to be escalating the situation toward violence.

According to Matt, at some point, Joanie went inside and talked with appellant for a couple minutes. Shortly after Joanie came back outside, he heard yelling inside the house and could tell that appellant was on his way outside. Matt testified that appellant came out of the house "gun first" and said "I'm going to kill you, mother fucker," before he started shooting. David similarly testified that appellant stepped out of the house, leveled a gun towards him and Matt, and fired. Matt testified that he thought appellant was going to shoot and kill him and he was terrified. David similarly testified that he was so scared, he froze before being able to retreat to his car.

Matt testified that, as he took off into the Joneses' yard, he heard Senior and Joanie trying to get appellant back into the house. David testified that, once he realized Senior had appellant in the house, he set off across the front yard to find Matt, who he found hiding behind a tree. David testified that Matt was too afraid to make his way to David's car because he believed appellant was trying to kill him. And so David set off back toward his car alone and Matt stayed put. David testified that as he was approaching the patio, appellant appeared, put a gun about four feet from David's face, and said, "I'm going to kill you, mother fucker." According to David, he pleaded that he was "just trying to get out of here," and appellant responded by repeating his threat. David testified that appellant's son BJ came out of the house, put himself between appellant and David, pushed at appellant while repeatedly asking, "What are you doing?", and told David, "Get out of here." David and Matt left, called the police, and met with officers from the Sheriff's Department at a nearby gas station.

Matt testified that he suspected appellant's actions that night were related to an earlier event. According to Matt, the previous summer, he planned to take his daughter and appellant's son BJ to the beach in Corpus Christi. Matt testified that he had

not specifically asked appellant whether BJ could go, but that "everyone" knew they were planning the trip. But before they reached Corpus Christi, appellant called, demanded to know where BJ was, and demanded that he return home. Matt testified that appellant was cursing and yelling on the phone such that the children could hear, so he hung up. Matt called Senior and Joanie, and according to Matt, both told him to continue on to Corpus Christi. Matt testified that, shortly thereafter, the Sheriff's Department called him and instructed him to return BJ to his father, which he did.

*Testimony from eyewitnesses*

According to Senior, on the night of the offense, Joanie woke him up and told him Matt was outside yelling and screaming that appellant hit his truck. Senior recounted hearing Matt yelling from inside the house. Senior testified that he went outside to see Matt standing near his truck and yelling "Look what [appellant] did. He knocked a big dent in my truck. And I'm going to—I want you to get him out here. I'm going to kick his butt." Senior testified that he had seen Matt have more than ten alcoholic drinks that night and that Matt was so drunk he could hardly stand. Senior testified that he spent 20 to 30 minutes trying to get Matt to leave to avoid a confrontation. Senior agreed that, at the time, everyone thought appellant dented Matt's truck, but to this day, they do not know what caused the damage.

Senior testified that appellant stepped outside of the house, said "I'll be right back," and went back inside. According to Senior, appellant came back outside a few minutes later with a pistol, said to Matt, "I got something for you," pointed the pistol in the air, and fired it. Senior testified that Matt and David both took off running and

he ran to get appellant back into the house. Senior recounted that appellant went in one door, then moments later came out another door, resumed yelling at Matt, and again shot the gun into the air.

On cross-examination, defense counsel elicited that Senior had only first spoken with someone from the District Attorney's office the day before his testimony. Senior testified that he thought Matt and David arrived at his home around 2:30 a.m. or 2:45 a.m. Senior testified that he and Joanie were standing between appellant and Matt when appellant first fired the gun. Senior testified that appellant was a good shot and that, had he intended to, shooting Matt that night would have been an "easy shot." Senior testified that appellant was a licensed security officer through the Austin Police Department at the time of the offense. By Senior's estimation, appellant had tried to remove two drunken trespassers from the property and had not intended to hurt anyone that evening.

*Testimony from Responding Officers*

Deputy J. Spitzer responded to Matt's 911 call.[1] He testified that Matt did not seem threatening or intoxicated and was able to tell him about the attempted trip to Corpus Christi and about his version of events that evening, beginning with Joanie borrowing his truck to drive home. Deputy Spitzer also talked with David, Joanie, and Ashleigh at the gas station and recalled hearing consistent stories from all.

Detective L. Shaffer testified that he recovered the only tangible evidence from the scene: a 9-millimeter shell casing. He also spoke with Matt, Joanie, and Senior about what happened. Detective Shaffer testified that each offered a consistent recounting of what happened except for Joanie, who told him that appellant fired the gun into the air—not at Matt or David.

1. Deputy Spitzer has since been promoted to detective.

Detective Shaffer did not notice any signs of intoxication while interviewing witnesses. Detective Shaffer testified that he arrived at the scene at 4:41 a.m., and the judge signed an arrest warrant for appellant by around 7:00 a.m. the same morning. Detective Shaffer explained that the process moved so quickly because it was a "pretty clearcut" matter.

Officer K. Robertson, along with another 10 to 15 deputies, participated in executing appellant's arrest warrant the next morning. After receiving a 911-call from Joanie reporting that appellant was at the residence, the deputies apprehended appellant inside the house. Officer Robertson further testified that appellant showed him where the gun was hidden: among rocks just outside the house.

*Defense witnesses*

Defense counsel called three witnesses: Senior, Joanie, and BJ. As was the case with Senior, though more than two years had passed, Joanie first spoke with someone from the district attorney's office the day before trial. Joanie testified that "Matt's a good guy" who she "thought the world of" and still does.

Joanie testified that, over the hours they were together on the night of the offense, she saw Matt drink roughly four margaritas, four red bull and vodkas, and at least three other alcoholic beverages. Joanie testified that, by the time she drove herself home that evening, Matt was having difficulty walking straight. Joanie testified that she noticed Matt's truck parked very close to the cars in the neighboring parking spaces such that persons trying to access adjacent vehicles would have had some difficulty doing so.

Joanie testified that she borrowed Matt's truck to drive home from the Stardust sometime before midnight. She testified that around 2:00 or 2:30 a.m., she was at home and heard someone outside honking a car horn. Joanie testified that she woke Senior and they went outside to find Matt and David both there and both drunk. Joanie testified that over the course of 20 or 25 minutes, she and Senior tried to get Matt to leave the property. Joanie testified that Matt would not leave and instead was calling to appellant to come outside because Matt "wanted to kick his butt." Joanie testified that, at some point, she went into the house to check whether appellant's hands had blood on them. Joanie found no blood or cuts on appellant's hands, leading her to think that he had not punched Matt's truck.

She recounted that appellant came to the door, went back inside, and then came back out the door with a gun. Joanie testified that though appellant did fire the gun upwards into the air, he did not point the gun at Matt or David. She testified that she and Senior were both standing between appellant and the complainants when appellant fired the gun. Joanie testified that given where everyone was standing, had appellant tried to shoot Matt or David, he would have hit Joanie, Senior, or BJ. She testified that appellant was an "excellent shot" and that she believed he could have shot someone that night had he intended to. Joanie maintained, however, that appellant merely intended to "scare" Matt and David off the property.

Though she remembered appellant yelling and cursing at Matt, she testified that appellant never said he was going to shoot Matt and never threatened to kill Matt. Joanie testified that Matt and David's intoxication and yelling was "the reason the whole thing blew up." Joanie testified that she told the officers that Matt and David were intoxicated, but acknowledged that, at the Valero where they met the police officers, Matt and David seemed to have "sobered up quite a bit."

Appellant's son BJ testified that he was sleeping on the couch when he was awakened by the sound of yelling and screaming outside the house. BJ testified that he stayed in the house until he heard the first gun shot. Then appellant walked into the house through one door and exited the front door of the house. BJ testified that he followed and saw that, when appellant fired the second shot, Matt was nowhere in sight, but David was in the driveway. BJ testified that he was standing within a few feet of appellant when appellant fired the second shot and that appellant pointed the gun into the air when he fired. BJ testified that, without a doubt, appellant was not trying to shoot Matt or David.

At the close of evidence, the jury found appellant guilty of aggravated assault with a deadly weapon against Matt, but found appellant not guilty of the same offense against David. This appeal followed.[2]

## Sufficiency of the Evidence

In his first issue, appellant challenges the sufficiency of the evidence to support his conviction on the grounds that the State failed to establish (1) that he possessed the requisite mens rea for the offense and (2) that he threatened harm to Matt.

### A. Standard of Review

■■■ An appellate court reviews legal and factual sufficiency challenges using the same standard of review. *See Griego v. State*, 337 S.W.3d 902, 902 (Tex.Crim.App. 2011). "Under this standard, evidence is insufficient to support a conviction if considering all record evidence in the light most favorable to the verdict, a factfinder could not have rationally found that each essential element of the charged offense was proven beyond a reasonable doubt." *Gonzalez v. State*, 337 S.W.3d 473, 478 (Tex.App.—Houston [1st Dist.] 2011, pet. ref'd) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; or (4) the acts alleged do not constitute the criminal offense charged. *Id.* at 479. The sufficiency of the evidence is measured by the elements of the offense as defined in a hypothetically correct jury charge, which is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997). If an appellate court finds the evidence insufficient under this standard, it must reverse the judgment and enter an order of acquittal. *Gonzalez*, 337 S.W.3d at 479.

■■■ An appellate court "determine[s] whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex.Crim. App.2007)). When the record supports con-

**2.** On April 21, 2015, the Texas Supreme Court ordered this appeal transferred from the Court of Appeals for the Third District of Texas. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases). We are unaware of any conflict between the precedent of the Court of Appeals for the Third District and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

flicting inferences, an appellate court presumes that the factfinder resolved the conflicts in favor of the verdict and defers to that resolution. *Id.* (citing *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793). "An appellate court likewise defers to the factfinder's evaluation of the credibility of the evidence and weight to give the evidence." *Gonzalez*, 337 S.W.3d at 479. A court treats direct and circumstantial evidence equally: circumstantial evidence can be as probative as direct evidence, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13).

## B. Applicable Law

Under the Texas Penal Code, a person commits the offense of assault if he "intentionally or knowingly threatens another with imminent bodily injury." Tex. Penal Code § 22.01(a)(2). The offense becomes an aggravated assault if that person "uses or exhibits a deadly weapon during the commission of the assault." Tex. Penal Code § 22.02(a)(2).

 Intent may be inferred from circumstantial evidence, including acts, words, and conduct. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App.2004). It is well settled that a threat may be communicated by action, conduct, or words. *See McGowan v. State*, 664 S.W.2d 355, 357 (Tex.Crim.App.1984). The Texas Penal Code defines "bodily injury" to mean "physical pain, illness, or any impairment of physical condition." Tex. Penal Code § 1.07(a)(8). A firearm is considered a deadly weapon. Tex. Penal Code § 1.07(a)(17)(A). The act of pointing a loaded gun at someone, by itself, is threatening conduct that supports a conviction for aggravated assault. *Fagan v. State*, 362 S.W.3d 796, 799 (Tex.App.—Texarkana 2012, pet. ref'd).

## C. Analysis

 To obtain a conviction for aggravated assault with a deadly weapon, the State was required to establish that appellant intentionally or knowingly threatened Matt with imminent bodily injury while using or exhibiting a deadly weapon. *See* Tex. Penal Code § 22.02(a)(2). Here, Matt testified that appellant pointed the gun at him, verbally threatened him, and fired the weapon. Matt further testified that he feared for his life. Based on such evidence and reasonable inferences therefrom, a rational jury could have found appellant intentionally or knowingly threatened Matt with imminent bodily injury while exhibiting a firearm. *See Fagan*, 362 S.W.3d at 799.

Appellant contends that contrary testimony from defense witnesses instead established that appellant fired the gun upwards into the air, did not threaten to kill Matt, and merely intended to remove Matt and David from the property. However, in our sufficiency review, we may not reevaluate the weight and credibility of the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App.2010). We must defer to the jury's resolution of conflicting evidence in the State's favor. *Temple v. State*, 390 S.W.3d 341, 360 (Tex.Crim.App. 2013). Accordingly, we conclude that the State adduced evidence from which a rational trier of fact could have found beyond a reasonable doubt that appellant intentionally threatened Matt with imminent bodily injury while exhibiting a firearm. *See Fagan*, 362 S.W.3d at 799.

We overrule appellant's first issue.

## Ineffective Assistance

In his second issue, appellant contends that his trial counsel failed to provide effective assistance by failing to (1) obtain a hearing and ruling on his Motion for Speedy Trial, (2) cross-examine all but one

of the State's witness, and (3) engage defense experts.

## A. Standard of Review and Applicable Law

We consider claims of ineffective assistance of counsel under the two-prong test adopted in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex.Crim.App.1999). To prevail on an ineffective assistance of counsel claim, appellant must show that (1) counsel's performance was deficient—meaning it fell below an objective standard of reasonableness—and (2) the deficiency prejudiced the defendant—meaning there was a reasonable probability that, but for the counsel's deficient performance, the results of the trial would have been different. *Id.*; *Ex parte Napper*, 322 S.W.3d 202, 246, 248 (Tex.Crim.App.2010). A reasonable probability is a probability sufficient to undermine confidence in the outcome, meaning that counsel's errors must be so serious that they deprive appellant of a fair trial. *Smith v. State*, 286 S.W.3d 333, 340–41 (Tex.Crim.App.2009).

As we review appellant's claim of ineffective assistance, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather than judging trial counsel's decisions with the benefit of hindsight, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052, 2064.

"[T]rial counsel should ordinarily be afforded an opportunity to explain his action before being denounced as ineffective." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex.Crim.App.2005) (quoting *Rylander v. State*, 101 S.W.3d 107, 111 (Tex.Crim.App.2003)). "Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim.App.2001), *cert. denied*, 537 U.S. 1195, 123 S.Ct. 1351, 154 L.Ed.2d 1030 (2003)). "When the record is silent on the motivations underlying counsel's tactical decisions, the appellant usually cannot overcome the strong presumption that counsel's conduct was reasonable." *Mallett v. State*, 65 S.W.3d 59, 63 (Tex.Crim. App.2001) (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App.1999)). "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Id.* (citing *Thompson*, 9 S.W.3d at 813–14).

## B. Analysis

Appellant contends that trial counsel rendered ineffective assistance by failing to cross-examine several witnesses, failing to obtain a ruling on a motion for speedy trial violations, and failing to present expert testimony. However, because appellant did not adduce evidence to support his ineffective assistance claims in a motion for new trial, we have no record to explain trial counsel's strategy. As a result, in order to overcome the presumption of reasonably professional assistance, appellant has the burden to show that his trial counsel's conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed*, 187 S.W.3d at 392.

### 1. Cross-examination

Appellant complains that trial counsel provided ineffective assistance of counsel by not cross-examining the two complainants and the three testifying officers.

"Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex.Crim.App.2005) (citing *Coble v. State*, 501 S.W.2d 344, 346 (Tex.Crim.App.1973)). "Furthermore, cross-examination is an art, not a science, and it cannot be adequately judged in hindsight." *Id.* "If ineffective, cross-examination can serve to bolster the credibility of the witness and underscore the very points that are sought to be impeached. Thus, unless there is a good basis on which to cross-examine ... it can be more effective to refrain from cross-examining a damaging witness to minimize the impact of his testimony." *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex.App.—Houston [14th Dist.] 1996, pet. ref'd).

■ Here, trial counsel could have reasonably determined that cross-examination of complainants and the testifying officers would have been more damaging than beneficial. In the absence of a more developed record elucidating trial counsel's strategy with regard to cross-examination, appellant has not overcome the strong presumption that trial counsel's decisions regarding cross-examination fall within the wide range of reasonable professional assistance. *Ex parte McFarland*, 163 S.W.3d at 755–57.

### 2. Speedy trial complaint

■ Appellant further complains that trial counsel provided ineffective assistance of counsel by not obtaining a ruling on a motion to dismiss alleging a violation of appellant's speedy trial rights.

On November 7, 2012, appellant was indicted for one count of aggravated assault with a deadly weapon against Matt. On June 5, 2013, appellant was indicted for two counts of aggravated assault with a deadly weapon against Matt and David. The State subpoenaed witnesses for trial settings on October 28, 2013; January 6, 2014; February 11, 2014; April 1, 2014; July 28, 2014; November, 10, 2014; January 26, 2015; and March 9, 2015. Trial was delayed on each occasion for reasons not apparent on the face of the record. On January 20, 2015, appellant filed a motion to dismiss for lack of speedy trial. There is no indication in the record that the trial court held a hearing or ruled on this motion. Appellant's jury trial commenced on March 9, 2015.

■ Absent a showing that a pretrial motion had merit and would have changed the outcome of the case, counsel will not be considered ineffective for failing to assert the motion. *See Jackson v. State*, 973 S.W.2d 954, 957 (Tex.Crim.App.1998) (citing *Roberson v. State*, 852 S.W.2d 508, 510–12 (Tex.Crim.App.1993)). The Supreme Court directs that we weigh and balance four factors to determine whether there has been a violation of the constitutional right to a speedy trial: (1) length of the delay; (2) reason for the delay; (3) assertion of the right; and (4) prejudice to the accused. *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972). None among these four factors is either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. *Id.* at 533, 92 S.Ct. 2182.

Here, though the record demonstrates that roughly two years elapsed between appellant's arrest and trial, the record does not explain the reason for the delay nor does it demonstrate that the delay prejudiced appellant. Appellant similarly does not explain in his brief how he was

prejudiced. Absent a record that elucidates trial counsel's strategy, we are unable to assess whether appellant's speedy trial claims had merit and, relatedly, whether trial counsel's decision not to obtain a hearing and ruling on the motion raising such violations falls outside the wide range of reasonable professional assistance. *See Crocker v. State,* 441 S.W.3d 306, 313–14 (Tex.App.—Houston [1st Dist.] 2013, pet. ref'd) (presuming, in face of silent record, that trial counsel had valid strategic reason for failing to pursue speedy trial claim); *see also Dean v. State,* No. 12–03–00074–CR, 2004 WL 1486154, at *5 (Tex.App.—Tyler June 30, 2004, pet. ref'd) (mem. op.) (not designated for publication) (holding that ineffective assistance claim based on failure to pursue speedy trial violation must fail where record silent as to counsel's strategy), *cert denied,* 545 U.S. 1118, 125 S.Ct. 2910, 162 L.Ed.2d 301 (2005).

### 3. Presentation of expert testimony

 Finally, appellant complains that trial counsel provided ineffective assistance by failing to engage expert witnesses. Though appellant suggests two categories of expert testimony would have assisted in his defense, he has not adduced evidence showing that such experts were available or that either could have offered beneficial testimony. *See Cantu v. State,* 993 S.W.2d 712, 719 (Tex.App.—San Antonio 1999, pet. ref'd) ("A defendant who complains about trial counsel's failure to call witnesses must show the witnesses were available and that he would have benefitted from their testimony") (first citing *King v. State,* 649 S.W.2d 42, 44 (Tex.Crim.App. 1983), then citing *Kizzee v. State,* 788 S.W.2d 413, 416–17 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd)).

Nonetheless, appellant relies on *Ex parte Briggs,* 187 S.W.3d 458 (Tex.Crim. App.2005), to argue that trial counsel ren-dered ineffective assistance in failing to present expert testimony from a crime scene reconstructionist or intoxication expert. In *Briggs,* the Court of Criminal Appeals held that trial counsel's decision not to fully investigate the victim's medical records or consult with experts constituted ineffective assistance because, according to trial counsel's affidavit, the decision not to do so was an economic—not strategic—one. *Briggs,* 187 S.W.3d at 467–68. The court explained that, faced with a client unable to pay additional money for medical experts, a reasonably competent attorney would have pursued options including subpoenaing treating doctors and eliciting their expert opinions, withdrawing from the case while explaining that the accused was indigent and requesting appointed counsel, or remaining as counsel while seeking fees from the trial court for his now-indigent client. *Id.* at 468. In contrast, trial counsel's decision to do nothing in the face of economic limitations did not reflect reasonable professional judgment. *Id.* at 469.

Unlike in *Briggs,* we have no evidence of trial counsel's strategy. Thus, we have no indication that trial counsel's decision not to introduce expert testimony was based on financial considerations. It is possible that trial counsel had a valid strategic reason for not presenting expert testimony wholly unrelated to the financial considerations explored in *Briggs.* Accordingly, on this record, *Briggs* remains inapposite.

In sum, we conclude that the record does not include evidence necessary to overcome the presumption that trial counsel's actions were reasonable, professional, and motivated by sound trial strategy. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' ").

We overrule appellant's second issue.

## Conclusion

We affirm the trial court's judgment.

