**Opinion issued April 2, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-22-00804-CR**

**NO. 01-22-00805-CR**

————————————

**BAYRON RIVERA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 337th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 1638093, 1638094**

---

**MEMORANDUM OPINION**

A jury convicted appellant Bayron Rivera of two counts of the second-degree

felony offense of aggravated assault by threat.[1] The trial court assessed Rivera's

---

[1]     *See* TEX. PENAL CODE §§ 22.02(a)(2) (providing that person commits offense of
        aggravated assault if person commits offense of assault and uses or exhibits deadly

punishment at twenty years' confinement for each offense and ordered the sentences to run concurrently.

In one issue, Rivera argues that the State failed to present sufficient evidence that he intentionally or knowingly threatened one of the complainants with a deadly weapon. We affirm.

## Background

On July 4, 2019, Reginald Smith, his girlfriend, Jasmin Wolford, and their two toddler-aged children intended to celebrate the holiday at a relative's house. In the late afternoon, they left their house and went to a fireworks stand to purchase fireworks. Smith was driving his pickup truck, with Wolford sitting in the front passenger seat and the two children sitting in their car seats in the back of the cab.

The fireworks stand was located in a parking lot at the intersection of Veterans Memorial and Highway 249 in north Houston. Smith and Wolford purchased approximately $300–$400 worth of fireworks. Smith put the boxes of fireworks in the rear floorboard, on the rear seat directly behind the driver's seat, and in the floorboard of the front passenger seat next to Wolford's legs. Upon leaving the fireworks stand, Smith turned onto Veterans Memorial and tried to get into the right lane so he could turn onto Highway 249. Rivera, however, was traveling down

---

weapon during commission of assault), 22.01(a)(2) (providing that person commits offense of assault if person intentionally or knowingly threatens another with imminent bodily injury).

Veterans Memorial in his car, and he "[sped] up a little bit to try to beat [Smith] from getting out of the traffic."

Smith was able to get into the right lane. Rivera's car pulled up beside him on the driver's side, and both vehicles stopped at the red light for Veterans Memorial and Highway 249. Smith could see that Rivera was saying something, so Smith rolled his window down. Rivera used profanity and a racial slur. Wolford could not hear what Smith and Rivera said, but she agreed with the prosecutor that they were not "exchang[ing] words in a friendly manner." The disagreement escalated to the point that Smith suggested that he and Rivera "just get out of the car where we can fight." Although Rivera agreed to this plan, the traffic light turned green before either man could get out of his vehicle, and Smith turned onto Highway 249.

After Smith turned onto Highway 249, he saw that Rivera "kind of came from the left lane [of Veterans Memorial] and cut off another car to turn right where [Smith] went on 249." Smith then "lost sight of" Rivera's car. After Smith drove through the next traffic light on Highway 249, Wolford remembered that she needed diapers for their youngest child. Smith turned around and drove back to the intersection of Veterans Memorial and Highway 249 so Wolford could buy diapers at a Walgreens.

As Smith left the Walgreens parking lot following Wolford's purchase, they both saw Rivera's car and Wolford wondered aloud if Rivera was following them.

After making a U-turn on Veterans Memorial, Smith stopped at the red light for Veterans Memorial and Highway 249, again waiting to turn onto Highway 249. Rivera once again pulled up next to Smith's truck, this time on the passenger side. While the windows of both vehicles were down, Rivera asked Smith, "So you ready to do this?" After Smith asked what Rivera meant, Rivera stated, "Yeah, you know. Are you ready to do this?" Wolford, who was sitting in the passenger seat and was therefore in between Smith and Rivera, told Smith, "Just keep going." Wolford heard both men talk about fighting, but Rivera was the first to mention a fight during this encounter. The light then turned green, and Smith turned onto Highway 249.

Smith saw Rivera also turn onto Highway 249, and Rivera quickly sped up behind Smith. Smith then turned into the parking lot of a gas station "just to see what was going on." Smith parked near the gas pumps, while Rivera parked near the entrance to the parking lot. Both men got out of their vehicles. Rivera had an "AR rifle" in his hand.

Smith testified as follows concerning the conversation he had with Rivera at the gas station:

Q. What—who started the conversation?
A. When I looked around, I started talking.
Q. What did you say?
A. I was, like, Oh, you got a gun, bro. And I was, like, Put the gun down. You know what I'm saying? You want to fight? He was, like, No, fuck that. I'm trying to spray your shit up.

Q.  What did you interpret that to mean?

A.  So, basically, that mean[t] he was trying to shoot up my car, basically.

Q.  And how did you respond?

A.  I was, like, Man, I got my kids in the car, bro. Like, it ain't even that serious. Put the gun down. We can fight. And he was, like, Man, fuck that. I'm trying to spray your shit up.

Q.  So twice he said, I'm trying to spray your shit up?

A.  Yes, sir.

While Smith was talking with Rivera, Wolford was mostly focused on her children in the truck. She did not start paying attention to the men until she saw Smith start "backing up towards the truck with his hands up." Wolford heard Rivera say, "Fuck that. I'm trying to blow y'all's shit up." Although Wolford never saw Rivera with a gun, Smith told her, "He had a gun."

After speaking with Rivera, Smith attempted to de-escalate the situation. He told Rivera, "You know what? You got it." Smith then got back into his truck and drove away from the gas pumps. Smith had a loaded 9mm handgun with him throughout his encounters with Rivera, but it remained in a space underneath the cupholders between the front seats of his truck. Smith did not touch his firearm.

As Smith pulled onto Highway 249, he saw Rivera "kind of getting back out of his car." Smith then heard a "big bang" and saw sparks inside of his truck. He believed that Rivera was shooting at him, so he "just kept going." Smith heard

"multiple bangs," but he kept driving to get his family a safe distance away from Rivera. Eventually, he stopped the truck and noticed that the fireworks he had purchased were going off inside of his truck and a fire had started.[2] Wolford testified that she "heard a ping, the gunshot; and then after that it was just the fireworks went off so it was just a bunch of boom, boom, like, loud noises."

Smith and Wolford rushed to get their children out of the rear seat of the truck, which was where the fireworks were detonating. The fire engulfed Smith's truck and fireworks kept going off, making it difficult for Smith to unbuckle one of his children

---

[2] One of the contested issues at trial was how the fireworks in Smith's truck ignited. The State presented evidence that Rivera and his family turned in a rifle that had been in his possession. Crime Scene Unit officers recovered six fired .223 caliber cartridge casings at the gas station. The fire investigator opined that the source of ignition was "the projectile from the rifle," stating that he had ruled out every other possible heat source. The surveillance video from the gas station showed a spark around the same time that Smith pulled back onto Highway 249 and just before the fireworks ignited. The investigating detective testified that the spark appeared to be a bullet ricocheting off Smith's truck. Rivera's expert in fire investigation opined that the spark outside the truck was caused by a firework igniting, but he also testified that he could not reach a conclusion about how the fire started inside the truck.

Examination of Smith's truck following the fire revealed several "defects" in the doors of the truck, although investigating officers could not testify as to what caused those defects or when they had occurred. Officers recovered cartridge casings, bullet projectiles, and live rounds from Smith's truck, but these items were all 9mm, which matched the caliber of Smith's handgun. Officers also recovered Smith's handgun, which was encased in melted plastic and had the hammer pulled back in a ready-to-fire position. Officers did not find any .223 caliber casings or projectiles in Smith's truck. The fire investigator did not find this fact significant, as a rifle projectile could have been hidden by other metal fragments in the burned truck. Surveillance footage also showed a dark-colored object on the ground near where Rivera's vehicle had been parked at the gas station, and one of the investigators agreed that it looked like a firework. Wolford denied that she or Smith lit a firework while in the truck.

from the car seat. Smith was finally able to get both children out of the truck. A Good Samaritan and first responders transported the family to multiple hospitals over the course of the evening. Although Smith and the children suffered serious burns, everyone in the family survived.

A grand jury charged Rivera with four offenses: aggravated assault by threat with a deadly weapon against Smith; aggravated assault by threat with a deadly weapon against Wolford; and two counts of injury to a child against the children.[3] The jury found Rivera guilty of both aggravated assault charges, but it was unable to reach a verdict on the injury to a child charges. The trial court declared a mistrial as to the injury to a child charges. After the punishment phase of trial, the court assessed Rivera's punishment at twenty years' confinement for each aggravated assault charge. The court ordered the sentences to run concurrently. This appeal followed.

---

[3] The offense against Wolford was tried in trial court cause number 1638094 and resulted in appellate cause number 01-22-00804-CR. The offense against Smith was tried in trial court cause number 1638093 and resulted in appellate cause number 01-22-00805-CR.

**Sufficiency of the Evidence**

In his sole appellate issue, Rivera argues that the State failed to present sufficient evidence that he intentionally or knowingly threatened Wolford with a deadly weapon.[4]

### A. *Standard of Review*

When reviewing whether sufficient evidence supports a conviction, we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences from the evidence, a rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). The factfinder bears the responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Edwards*, 666 S.W.3d at 574 (quoting *Jackson*, 443 U.S. at 319); *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023) (stating that factfinder is sole judge of "the credibility and weight to be attached to the testimony of witnesses").

---

[4]    Although Rivera also filed a notice of appeal of his conviction for aggravated assault against Smith, Rivera presents no appellate arguments challenging this conviction. Instead, Rivera's arguments on appeal relate solely to his conviction for aggravated assault against Wolford.

We may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Edwards*, 666 S.W.3d at 574. When the record supports conflicting inferences from the evidence, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dunham*, 666 S.W.3d at 482.

In our review, we consider "the cumulative force of the evidence." *Edwards*, 666 S.W.3d at 574; *see Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (stating that we may not use "divide and conquer" strategy when evaluating sufficiency of evidence). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Circumstantial evidence is as probative as direct evidence, and circumstantial evidence alone may be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013).

**B.     *Aggravated Assault by Threat***

On appeal, Rivera argues that the State presented no evidence that he intentionally or knowingly threatened Wolford by his words, actions, or conduct. He acknowledges Wolford's testimony that she heard a ping and a gunshot before the fireworks in the truck ignited, but he argues that this was not evidence of a threat.

Rather than evidence of a threat, this was instead evidence that he "didn't merely threaten to do something to Ms. Wolford; he just went ahead and did it."

A person commits the offense of assault if he intentionally or knowingly threatens another with imminent bodily injury. TEX. PENAL CODE § 22.01(a)(2). A person commits the offense of aggravated assault if he "commits assault as defined in [Penal Code section] 22.01," and he uses or exhibits a deadly weapon during commission of the assault. *Id.* § 22.02(a)(2). The indictment and jury charge in this case required the State to prove that Rivera intentionally or knowingly threatened Wolford with imminent bodily injury by using or exhibiting a deadly weapon, namely, a firearm.

"A person commits assault by threat when he acts with the intent to cause in another person a reasonable apprehension of imminent bodily injury, though not necessarily with the intent to cause such harm." *Jefferson v. State*, 346 S.W.3d 254, 256–57 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). A person acts intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE § 6.03(a). A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b).

Generally, the factfinder may infer intent from circumstantial evidence such as the defendant's acts, words, and conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Similarly, with respect to threats specifically, threats "may be communicated by action or conduct as well as words." *McGowan v. State*, 664 S.W.2d 355, 357 (Tex. Crim. App. 1984); *Jones v. State*, 500 S.W.3d 106, 113 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *see Smith v. State*, 286 S.W.3d 333, 343 (Tex. Crim. App. 2009) ("A threat can be both verbal and nonverbal."). A firearm is considered a deadly weapon. TEX. PENAL CODE § 1.07(a)(17)(A); *Jones*, 500 S.W.3d at 113.

In *McGowan*, the Court of Criminal Appeals addressed whether the State presented sufficient evidence to support convictions for aggravated assault by threat against a mother and daughter. The defendant physically attacked the daughter but did not make any verbal threats to her. *See McGowan*, 664 S.W.2d at 357. The daughter yelled to her mother for help, and they attempted to go home but were pursued by the defendant. *Id.* The defendant hit the daughter, kicked her, and stabbed her in the stomach. *Id.* After the defendant stabbed her, the daughter saw a knife and asked the defendant not to cut her. *Id.* When the mother reached down to help her daughter, the defendant stabbed the mother in the back of the head. *Id.* The mother did not see what she had been hit with. *Id.*

The Court of Criminal Appeals affirmed the defendant's conviction for aggravated assault of the daughter by threat. *Id.* at 358. The court concluded that because the evidence at trial showed that, after initially being stabbed, the daughter saw the knife and begged the defendant not to cut her, the State presented sufficient evidence that the defendant had threatened the daughter. *Id.*

However, with respect to the mother, there was no evidence that the mother knew what the defendant had used to strike her. *Id.* at 357. The mother was "merely trying to pull her daughter away from" the defendant, and there was no evidence that the defendant threatened the mother prior to stabbing her. *Id.* "She never saw [the defendant] holding a knife nor did she testify that [the defendant] threatened her with a knife." *Id.* Additionally, the defendant fled after he stabbed the mother. *Id.* at 357–58. The Court of Criminal Appeals concluded that although the evidence showed the mother had been injured, the evidence was insufficient to show that she had been threatened. *Id.* at 358.

More than twenty years after *McGowan*, in *Olivas v. State*, the Court of Criminal Appeals considered whether a complainant must perceive the threat for there to be sufficient evidence to support a conviction for assault-by-threat. The court began by recognizing that Penal Code section 22.01(a)(2) "does not explicitly indicate whether the intended victim must perceive or receive the threat." *Olivas v. State*, 203 S.W.3d 341, 345 (Tex. Crim. App. 2006); *see Landrian v. State*, 268

S.W.3d 532, 536 (Tex. Crim. App. 2008) (stating that section 22.01(a)(2) is "conduct-oriented, focusing upon the act of making a threat, regardless of any result that threat might cause"). Noting that the Penal Code does not statutorily define "threaten," the Court of Criminal Appeals looked to dictionary definitions and stated that each definition "indicates an act being performed, as opposed to an act which is perceived by an outside party." *Olivas*, 203 S.W.3d at 345 (quotations omitted). The court further considered the definition of "threat" found in Black's Law Dictionary—"A communicated intent to inflict harm or loss on another or on another's property"—and reasoned that this definition "could indicate either an act that is communicated by the actor to another, regardless of whether it is successfully perceived by the intended recipient, or one that is successfully communicated to the intended recipient." *Id.* at 345–46 (quoting *Threat*, BLACK'S LAW DICTIONARY 1203 (7th ed. 2000)). The court thus concluded that when considering the plain meaning of "threat," section 22.01(a)(2) "remains ambiguous." *Id.* at 346.

After discussing two Texas statutes[5] and a District of Columbia statute that criminalize threats, the Court of Criminal Appeals then turned to *McGowan* and

---

[5] The Court of Criminal Appeals discussed the robbery-by-threat statute—which provides that a person commits an offense if, in the course of committing theft, he intentionally or knowingly threatens *or* places another in fear of imminent bodily injury or death—and the terroristic-threat statute—which provides that a person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to place any person in fear of imminent serious bodily injury. *See Olivas v. State*, 203 S.W.3d 341, 346 (Tex. Crim. App. 2006) (quoting

whether that case requires a complainant to receive a threat as it occurs. *Id.* at 347–48. The court stated that *McGowan* was not so "broad of a holding" that the *McGowan* court "define[d] assault by threat as requiring a victim's perception of the threat." *Id.* at 348. While there was no testimony in *McGowan* that the mother comprehended a threat, "it was the lack of *any* evidence, not the mother's lack of perception of a threat, that led [the Court of Criminal Appeals] to conclude that the State failed to prove assault by threat." *Id.* at 348–49. "[A] more accurate description of the holding in *McGowan* is that there must be *some* evidence of a threat being made to sustain a conviction of assault by threat." *Id.* at 349. *McGowan* did not address whether section 22.01(a)(2) "requires an intended victim to perceive the threat," and that remained an "open" question following *McGowan*. *Id.*

The Court of Criminal Appeals did not resolve that question in *Olivas* because, under the facts of that case, even if the State was required to prove that the complainant perceived the threat, the State presented sufficient evidence to support the conviction. *Id.* In *Olivas*, the defendant stalked and harassed the complainant

---

TEX. PENAL CODE §§ 29.02(a)(2), 22.07(a)(2)). The language of both statutes indicates that "threaten" and placing a person "in imminent fear of" bodily injury, serious bodily injury, or death have "distinct meanings." *Id.* The Court of Criminal Appeals concluded that both statutes "imply that one can threaten without *necessarily* placing another in fear of imminent bodily injury." *Id.* A logical inference from this language was that "'threatening,' as used in the Penal Code, does not require that the intended victim perceive or receive the threat, but 'placing another in fear of imminent bodily injury' does." *Id.*

over the course of several weeks before the incident that formed the basis for the criminal charge. *Id.* at 342–43. As the complainant was driving one day, the defendant drove up beside her in his mother's car with the window partially rolled down. *Id.* The complainant recognized the car but could not immediately tell if the defendant was driving it. *Id.* at 343. She heard two "pops" and thought that the defendant had thrown rocks at her car. *Id.* When she pulled into a nearby parking lot and the defendant drove past, the complainant discovered that it was the defendant driving the other car. *Id.* She also discovered a bullet hole in the rear driver's side door of her vehicle. *Id.*

The Court of Criminal Appeals affirmed the defendant's conviction for aggravated assault by threat. *Id.* at 349–51. Although the complainant "did not instantaneously realize that [the defendant] had fired shots at her, she knew that he had done *something* threatening to her." *Id.* at 350. Nothing in Texas law required the complainant "to accurately perceive the *exact* threat that [the defendant] communicated." *Id.* "At most, the State was required only to prove that [the complainant] perceived a threat and that [the defendant] did, in fact, use or exhibit a firearm while making that threat." *Id.* The Court of Criminal Appeals also noted that section 22.01(a)(2) does not require that a complainant "must instantaneously perceive or receive that threat of imminent bodily injury as the actor is performing it." *Id.* at 350–51.

In this case, Smith and Wolford testified that they encountered Rivera three times on the afternoon of July 4, 2019, as they drove around the area surrounding the intersection of Veterans Memorial and Highway 249. In the first encounter, which occurred at a traffic light after Rivera sped up in his vehicle and momentarily prevented Smith from turning onto Veterans Memorial, Rivera directed profanity and racial slurs at Smith, who then challenged Rivera to a fight. Because the traffic light turned green and Smith was able to turn from Veterans Memorial onto Highway 249, no fight between the men materialized.

Shortly thereafter, during the second encounter, Smith and Rivera again exchanged words while stopped at the traffic light and sitting in their respective vehicles. Rivera had pulled up along the passenger side of Smith's truck, where Wolford was sitting. The windows of both vehicles were down, and Wolford heard Rivera mention fighting. However, the traffic light again turned green and Smith turned onto Highway 249 before a physical altercation could ensue.

The third encounter occurred minutes later in a nearby gas station parking lot. After Smith turned onto Highway 249, he saw Rivera turn and quickly speed up to follow him. Smith pulled into the gas station "just to see what was going on," and he parked near the gas pumps while Rivera parked near the entrance to the parking lot. Both men got out of their vehicles, and Smith testified that Rivera was holding an "AR rifle."

During their conversation in the parking lot, Smith remarked upon the fact that Rivera had a gun, and he told Rivera to put the gun down. Although Wolford was focused on her children in the back of their truck and did not pay much attention to Smith's conversation with Rivera, she heard Smith tell her that Rivera had a gun. Smith also testified that in response to his request to put the gun down and engage in a physical fight, Rivera replied, "No, fuck that. I'm trying to spray your shit up." Smith interpreted this statement to mean that Rivera intended to "shoot up [his] car, basically."

Smith told Rivera that his children were in the truck, and he pleaded for Rivera to put the gun down so they could fight instead. Rivera again responded that he was "trying to spray your shit up." Wolford did not see Rivera holding a gun, but she did hear Rivera say, "Fuck that. I'm trying to blow y'all's shit up." As Smith pulled back onto Highway 249, Wolford heard "a ping, the gunshot," and then fireworks started going off in their truck. Likewise, Smith heard several "bangs" before he realized that the fireworks had gone off and a fire had started in the truck.

We conclude that the State presented sufficient evidence that Rivera made a threat to Wolford, which she perceived. Although the disagreement was between Rivera and Smith, and not Rivera and Wolford, Rivera was aware that Wolford was in Smith's vehicle, as she was sitting in between Smith and Rivera during their second verbal exchange. At the gas station, Smith informed Wolford that Rivera had

a gun, and she heard Rivera say that he was "trying to blow y'all's shit up." A reasonable factfinder could infer from this evidence that Rivera intentionally or knowingly threatened all occupants of Smith's vehicle with imminent bodily injury and that he used or exhibited a deadly weapon—a firearm—while doing so.[6] *See Landrian*, 268 S.W.3d at 536; *Olivas*, 203 S.W.3d at 349–50.

We hold that sufficient evidence exists to support Rivera's conviction for aggravated assault by threat against Wolford. *See* TEX. PENAL CODE §§ 22.01(a)(2), 22.02(a)(2). We overrule Rivera's sole issue on appeal.

---

[6]    In his appellate brief, Rivera points out that Wolford testified that she was not afraid during the encounter at the gas station. When asked on direct examination whether Smith's statement that Rivera had a gun placed Wolford "in any fear," Wolford responded, "At the time, no, to be honest because in my head I kind of figured if he [Smith] made it to the truck, then we should be safe, right, so . . . ." We note that placing the complainant in fear is not an element of assault-by-threat under Penal Code section 22.01(a)(2). Instead, that subsection of the assault statute provides that a person commits the offense of assault if he "intentionally or knowingly threatens another with imminent bodily injury." TEX. PENAL CODE § 22.01(a)(2); *see Olivas*, 203 S.W.3d at 346 (comparing language of section 22.01(a)(2) to robbery-by-threat statute and terroristic-threat statute, both of which have language relating to placing another person in fear of imminent bodily injury, and concluding that statutes "imply that one can threaten without *necessarily* placing another in fear of imminent bodily injury").

## Conclusion

We affirm the trial court's judgments of conviction.

April L. Farris
Justice

Panel consists of Justices Goodman, Countiss, and Farris.

Do not publish. TEX. R. APP. P. 47.2(b).