**Modify and Affirm as modified; Opinion Filed October 19, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00546-CR

**COREY DEMON FRANKLIN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1575618-T**

# MEMORANDUM OPINION

Before Justices Fillmore, Stoddart, and Schenck
Opinion by Justice Stoddart

A jury convicted Corey Demon Franklin of murdering Jerry Johnson and sentenced him to eighty years' confinement. In two issues, appellant argues he suffered ineffective assistance of counsel and the evidence is insufficient. We modify the judgment to show appellant pleaded true to two enhancement paragraphs and the jury found the enhancement paragraphs to be true. As modified, we affirm the trial court's judgment.

FACTUAL BACKGROUND

Three people were present when Johnson was shot: appellant and his two uncles, Johnson and Crandall Kelly. Kelly and appellant testified at trial and presented different accounts of the events leading to Johnson's death.

The State presented Kelly as a witness. Kelly testified that on May 17, 2015, he and Johnson were at their mother's house. During their conversation, Kelly agreed to mediate on-going disputes between Johnson and appellant. Eventually Johnson left the house and appellant arrived. Kelly told appellant that Johnson believed appellant was selling drugs from their mother's house, which appellant denied. Appellant became angry after hearing the allegation. Kelly testified: "Corey is angry at Jerry because Corey is timid. Not timid as in a man but timid when it comes to fighting. And Jerry is real aggressive and Corey is scared of Jerry." Kelly also testified: "I told him in that conversation, I'm not going to let him fight you, I'm not going to let him jump on you." Kelly stated that he and his father both carried guns to protect themselves from Johnson.

When told Johnson would be returning to the house soon, appellant left through the front door. Kelly testified that appellant always departed from a place if he learned Johnson would be arriving. Johnson then returned to the house. While Johnson and Kelly were in the backyard, appellant also returned to the house and entered the yard through a gate on the side of the house. Kelly testified he was working on a chainsaw on the small porch, generally was looking down at the chainsaw, and did not see everything that transpired after appellant returned.

Appellant said to Johnson: "Uncle Jerry, Uncle Jerry, you telling Uncle Cran that you wasn't trying to fight me . . . But every time I see you, you keep running up on me and running up on me and running up on me. . . . I don't let people just keep coming up on me like that. I don't let nobody walk up on me. I don't let people walk up on me but you keep doing that." Appellant and Johnson yelled and cursed at each other, but their argument did not become physical. Kelly testified that appellant turned around to leave the yard, but then turned back and shot Johnson twice. Kelly stated: "He's bullying him, threatening him and he turned, he told him not to say something again and he said it anyway and he shot him. Yeah, he shot him." Kelly

–2–

looked up from the chainsaw when he heard the gun shot and saw appellant holding a gun. He did not see appellant shoot Johnson. After the shooting, appellant left the house and Kelly called 911.

Appellant testified in his defense. He stated his fear of Johnson began when he was in junior high school and Johnson hit his father. During that fight, appellant attempted to call 911, but Johnson "kicked me so hard between my legs I couldn't move." Appellant fell to the ground as Johnson attempted "to gouge my father's eye out and he left like cuts from his nails scratching over his eye."

Appellant testified Johnson threatened to hurt and kill him, telling "people that it was going to be either me or him." In early May 2015, Johnson threatened Kelly, who also was afraid of Johnson. Kelly told appellant he did not feel comfortable around Johnson without his gun. Approximately four days before the shooting, Johnson and his son "charged" appellant.

Appellant testified that he had no intention of talking to Johnson on May 17, 2015. Rather, he always attempted to avoid Johnson. However, on May 17, appellant arrived at the house, entered through the side gate, and went into the backyard where he saw Kelly. Appellant talked to Kelly for a long time, and followed Kelly inside the house. Eventually Johnson arrived, which made appellant nervous. Appellant attempted to exit the house by the front door, but was unable to because burglar bars across the front porch were locked. Instead he reached on to the top shelf of a cabinet where his grandfather hid a gun and put the gun in his pocket.

Appellant walked through the back door. The open screen door blocked his ability to exit one side of the small porch and Kelly, who was on the edge of the porch, blocked his exit from the other side. Johnson was at the bottom of the steps leading up to the house and "was getting ready to come up the stairs as I was walking out the door." Appellant asked Johnson what Johnson told Kelly about their confrontation a few days earlier and Johnson called appellant a

liar. They then began arguing and cursing, and appellant became "very nervous." Johnson then stepped on to the stairs leading to the house. Appellant testified: "he took the step up the stairs and I told him back up. So he was on the second step and I keep telling him to stay back, get back, just stay back."

Appellant told Johnson he knew that Johnson had stolen money from a family member, which caused Johnson's demeanor to drastically change. At that point, appellant knew he "messed up, I said the wrong thing." Johnson came up the steps and said he was going to hurt appellant. Appellant told him to back up and stepped back himself as though he was going back into the house. The second time Johnson moved toward appellant, appellant reached into his pocket, pulled out the gun, and told Johnson to stop. Appellant testified that when he pulled out the gun, Johnson "came on to me. . . he just moved on" so that the gun nearly touched the front of Johnson's chest. Appellant pressed the trigger and Johnson "went down the stairs and then he came back up the stairs and I told him back up again because he coming back up towards me again." Appellant shot Johnson again. He testified he did not intend to kill Johnson.

Appellant testified he was scared that he and Johnson "were going to fight, and I know that he got a punch, he packs a nice punch, and I was scared that he was going to hit me." And, if they did fight and someone called 911, appellant would go to jail because fighting violated the terms of his probation. He also was scared for his life.

On cross-examination, appellant testified he did not know whether Johnson was carrying a gun, but he had never seen Johnson with a gun. Johnson was not carrying a knife. Appellant testified "he never had anything in his hands but his fists." When asked: "So you shot your uncle Jerry Johnson, an unarmed man, in the chest?" appellant replied that he did.

Nathan Lewis, a relative of appellant's girlfriend, testified he met with appellant and his girlfriend on May 18, 2015. At that time, appellant told Lewis that "his uncle had pushed him

–4–

too far, he had assaulted him verbally and that he was making some attempts to defend himself and an altercation occurred from that event." Appellant said Johnson verbally threatened his life and he was afraid of being shot. Lewis believed Johnson had verbally assaulted and threatened appellant many times in the past. Johnson previously threatened appellant's girlfriend with a gun. Appellant gave a bag with some of his belongings to Lewis, and Lewis put the bag in his garage. He realized a gun was inside the bag. A detective from the Dallas Police Department went to Lewis's home and found a revolver with the barrel sawed off.

The forensic pathologist who performed the autopsy on Johnson's body testified that Johnson sustained two gunshot wounds, which caused his death. Both entrance wounds were on the front of Johnson's body.

## LAW & ANALYSIS

In his second issue, appellant argues the evidence is insufficient to support the conviction because the State failed to meet its burden of persuasion to disprove he acted in self defense.

As charged here, a person commits murder if he intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1). A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. *Id*. § 9.31(a). Under section 9.31, the use of force against another is not justified in response to verbal provocation alone. *Id*. § 9.31(b)(1). A person is justified in using deadly force against another (1) if he would be justified in using force against another under section 9.31 and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id*. § 9.32(a). "Deadly force" means "force that is intended or known by the actor to cause, or in

the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. § 9.01(3).

The defendant has the initial burden of producing evidence to raise self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). If the defendant produces some evidence, the State has the burden of persuasion to disprove the raised defense. *Zuliani*, 97 S.W.3d at 594. The State is not obligated to offer evidence refuting a claim of self-defense; rather, the State is required to prove its case beyond a reasonable doubt. *Id*. The issue of self-defense is a fact issue to be determined by the jury. *Saxton*, 804 S.W.2d at 913. Defensive evidence which is merely consistent with the physical evidence at the scene of the alleged offense will not render the State's evidence insufficient because the credibility determination of such evidence is solely within the jury's province and the jury is free to accept or reject the defensive evidence. *Id*. at 914. When a fact finder determines the defendant is guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594.

When an appellant challenges the sufficiency of the evidence to support the rejection of a self-defense claim, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt and also would have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914.

Appellant notes the jury heard two versions of the events that occurred on May 17, 2015: his and Kelly's. However, he asserts, based on the physical evidence presented at trial, the only plausible version of the events is the one he presented. In that version of events, appellant maintains, he reasonably believed Johnson posed a threat of death or serious bodily injury to him and his use of deadly force was justified.

If, as appellant urges, we credit his testimony and discredit Kelly's, the evidence does not support his conclusion that a rational trier of fact must have found in his favor on the self-defense issue. The evidence is uncontested that appellant and others were scared of Johnson. However, even if Johnson threatened appellant and others on previous occasions and even if family members were afraid of Johnson, a rational jury could have believed the use of deadly force was not immediately necessary on May 17. Appellant testified that he did not see any weapon on Johnson's person. Rather, appellant stated Johnson "never had anything in his hands but his fists." Appellant was scared that he and Johnson "were going to fight, and . . . he packs a nice punch, and I was scared that he was going to hit me." When asked: "So you shot your uncle Jerry Johnson, an unarmed man, in the chest?" appellant replied that he did.

Based on the evidence, a rational jury could have concluded that appellant's fear of Johnson coupled with Johnson walking toward appellant with nothing but his fists was not the use or attempted use of unlawful deadly force against appellant and appellant's belief that deadly force was immediately necessary was not reasonable under the circumstances. Considering all the evidence in a light most favorable to the verdict, and given the jury's role in resolving conflicts in the evidence, we conclude the jury could have rationally rejected appellant's claim of self-defense. *Garcia v. State*, No. 05-16-00640-CR, 2017 WL 3048478, at *6 (Tex. App.—Dallas July 19, 2017, pet. filed) (mem. op., not designated for publication) (collecting cases). We overrule appellant's second issue.

In his first issue, appellant argues he suffered ineffective assistance of counsel because his lawyer did not object to inadmissible evidence, failed to request a limiting instruction for each piece of extraneous offense evidence admitted, presented harmful video evidence to the jury, did not procure an expert witnesses, and failed to request a charge on sudden passion during the punishment phase of trial.

To prevail on an ineffective assistance of counsel claim, appellant must establish both that his trial counsel performed deficiently and that the deficiency prejudiced him. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). With respect to the first prong, the record on appeal must be sufficiently developed to overcome the strong presumption of reasonable assistance. *See Thompson v. State*, 9 S.W.3d 808, 813–14 (Tex. Crim. App. 1999). The defendant bears the burden to prove by a preponderance of the evidence that trial counsel's performance was deficient or not reasonably effective by showing that counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

"Isolated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective, nor can ineffective assistance of counsel be established by isolating one portion of trial counsel's performance for examination." *Id*. Counsel's performance is judged by "the totality of the representation" and, "judicial scrutiny of counsel's performance must be highly deferential" with every effort made to eliminate the distorting effects of hindsight. *Id*. The Supreme Court in *Strickland* cautioned that intrusive post-trial inquiry into attorney performance should be avoided because that would encourage the proliferation of ineffectiveness challenges. *See Strickland*, 466 U.S. at 690.

Absent an opportunity for trial counsel to explain his actions, we will not conclude his representation was deficient "unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Texas procedure makes it "'virtually impossible'" for appellate counsel to present an adequate ineffective assistance claim on direct review. *See Trevino v. Thaler*, 569 U.S. 413 (2013). The inherent nature of most ineffective assistance claims means that the trial court record

"will often fail to contain the information necessary to substantiate the claim." *Id*. (internal quotation omitted). As a result, the better procedural mechanism for pursuing a claim of ineffective assistance is almost always through writ of habeas corpus proceedings. *Freeman v. State*, 125 S.W.3d 505, 506 (Tex. Crim. App. 2003).

Here, the record does not include any testimony from appellant's trial counsel. Further, when we review the totality of counsel's representation, we cannot conclude he performed deficiently. Even though counsel's performance may not have been perfect, the right to effective assistance does not mean errorless or perfect counsel. *See Robinson*, 16 S.W.3d at 483.

For example, appellant complains that his trial counsel was ineffective for allowing the admission of at least nine inadmissible offenses without objecting or requesting a limiting instruction. The record shows the State began its cross-examination of appellant during the guilt/innocence phase by asking about appellant's prior convictions. Defense counsel interrupted the questioning and requested the parties approach the bench. A discussion, which was not reported, was held at the bench and then the State resumed questioning appellant about his prior convictions. The record does not show whether defense counsel objected to the admission of prior offenses, requested a limiting instruction, or moved for a mistrial during this bench conference. We will not assume he failed to do so.

Shortly after the bench conference, defense counsel again asked that the parties approach the bench because "[w]e object to impeachment . . . misdemeanors are not proper impeachment." The jury was removed from the courtroom and the trial court conducted a hearing during which the prosecutor, defense counsel, and the judge discussed impeachment evidence. The record shows defense counsel objected to the State's impeachment evidence and clearly explained the objections to the trial court. The record does not show counsel's representation was ineffective.

Appellant also complains about his counsel's decision to play a video from Nathan Lewis's interview with police because it contained inadmissible character evidence. The record shows defense counsel moved to admit the video and the "video played" to the jury. The record does not show whether the entire video was played or only the portion required to refresh Lewis's recollection was played. Further, although appellant argues on appeal that statements in the video were damaging to his credibility with the jury, when analyzing appellant's sufficiency argument, above, we concluded that even if the jury credited appellant's version of events and discredited Kelly's that a rational jury would not have been required to conclude appellant acted in self-defense. Thus, even if we were to assume that appellant's counsel erred by playing the entire video, appellant has not met his burden to show he was harmed.

Appellant alleges his counsel's performance was deficient because he failed to procure an expert witness to testify at trial. Although appellant argues his version of events could have been proven to be true through an expert witness's testimony concerning the forensic evidence, appellant adduced no evidence showing that such an expert was available or could have offered beneficial testimony. *See King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *Jones v. State*, 500 S.W.3d 106, 116 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Moreover, appellant argues the key to determining whether his killing of Johnson was in self defense is which version of events, his or Kelly's, is true and supported by the record. However, as previously discussed, even if the jury credited all of appellant's evidence and discredited Kelly's, the evidence does not compel the conclusion that he acted in self defense. Thus, even if we were to assume appellant's counsel erred by failing to procure an expert witness, he has not met his burden to show harm.

Finally, appellant argues his counsel was ineffective for failing to request a sudden passion instruction during the punishment phase. If we assume appellant met the first prong of the *Strickland* standard, appellant fails to show he was harmed. The jury charge authorized the

jury to assess appellant's punishment at confinement for life or for a term of not more than 99 or less than 25 years. The jury assessed punishment at eighty years' incarceration. On appeal, appellant has failed to show that there is a reasonable probability that he would have received a lesser sentence but for his counsel's alleged deficiencies.

On this record we cannot conclude appellant showed by a preponderance of the evidence that his counsel's performance was deficient. The record does not overcome the strong presumption of reasonable assistance and we decline to conclude defense counsel's performance was so outrageous that no competent attorney would have engaged in it. We overrule appellant's first issue.

### MODIFICATION OF JUDGMENT

The trial court's judgment mistakenly shows there were no enhancement paragraphs or jury findings on enhancement paragraphs. Because the necessary information is available in the record, on our own motion we modify the trial court's judgment to show appellant pleaded true to two enhancement paragraphs and the jury found two enhancement paragraphs to be true. *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd).

### CONCLUSION

We modify the trial court's judgment and affirm as modified.

/Craig Stoddart/
CRAIG STODDART
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
160546F.U05

–11–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

COREY DEMON FRANKLIN, Appellant

No. 05-16-00546-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F-1575618-T.
Opinion delivered by Justice Stoddart.
Justices Fillmore and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** to show appellant Corey Demon Franklin pleaded true to the first and second enhancement paragraphs and the jury found the first and second enhancement paragraphs to be true.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 19th day of October, 2017.