

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00065-CR

JOHN HOWARD DEARING, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Franklin County, Texas
Trial Court No. F9388

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

After John Howard Dearing was convicted of continuous sexual abuse of a young child, the trial court sentenced him to life in prison. On appeal, Dearing complains that his court-appointed trial counsel was ineffective for (1) not cross-examining the victim thoroughly regarding the details and circumstances of the abuse, (2) not objecting to the forensic interviewer testifying as an outcry witness, (3) not objecting to the forensic interviewer's testimony as to the victim's veracity, (4) not objecting to the State's improper impeachment of Dearing, (5) not objecting to the admission of an abuse intake worksheet, and (6) not objecting to the State's argument outside the record. We affirm the trial court's judgment because Dearing failed to demonstrate that his counsel was ineffective. We address each of the complaints in turn, after a review of salient evidence.

Jamie[1] was fifteen years old at the time of trial. She had a number of connections with Dearing and his wife, Tracy. Dearing was her father's stepfather, Jamie called Dearing grandpa, she lived next door to Dearing, and, even though her mother and father did not like the Dearings, she went over to Dearing's house "[a]lmost every day." She testified that Dearing "raped and sexually assaulted" her at his home in Mount Vernon, Franklin County, Texas, "too many [times] to count." She testified that Dearing started sexually assaulting her when she was seven years old and stopped when she was nine years old only because the Dearings moved away.

---

[1]To protect the victim's privacy, we refer to the victim in this case, her family, her friends, and anyone referenced who was a minor at the time of the abuse by pseudonyms. *See* TEX. R. APP. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

Jamie testified that, when she was seven, Dearing put her on the bed in his bedroom, took her clothes off, took his clothes off, and then "put his penis inside [her] vagina." She testified that it hurt, and she tried to stop him by pushing and kicking, but it did not work. She recounted an event happening when she was eight, in which he took her to his bedroom, pinned her arms down, and raped her. When asked what she meant by "raped," she said that "[h]e put his penis inside [her] vagina." Jamie testified that the time when she was eight was different than when she was seven because then she "stopped fighting." She testified to another event, this one at age nine, in which Dearing penetrated her vagina with his penis, but then she knew that what Dearing was doing to her "was wrong." He penetrated her that way "a lot more than three times." On occasion, he would tie her hands with socks before he raped her. Jamie testified that he always raped her in his bedroom, but that, through the three years of abuse, Dearing would also touch and grab her breasts "anywhere," if they were alone. She admitted that she continued going over to Dearing's house despite the abuse.

Jamie testified that, while Dearing was sexually abusing her, he told her that she "behaved better than the others." She eventually figured out that he was referring to the "other girls he raped, touched." When she tried to fight him off, he would threaten to hurt her family.

When Jamie was eleven years old, she told her friend about the abuse, the first time Jamie had ever told anyone about it. Her friend threatened that, if Jamie did not tell her parents, she would do so. So, Jamie told her mother, Tina, about the abuse but did not go into detail about it. Her mother took her to the police department, and they had an interview set up with the

3

Northeast Texas Child Advocacy Center (CAC). At the CAC, she spoke with an interviewer, Jenni Harwood, and Jamie told her about the abuse in detail.

Jamie testified that, because of the abuse, she was "scared of a lot of things, like older men or men that work with kids." She had become "distant to everyone" and stopped interacting with people. Tina testified that, in general, Jamie was not doing well and that it was a result of her being sexually abused by Dearing.

Tina testified that Jamie started spending a lot of time at the Dearings' house when she was five or six years old. She went over there almost every day. Sometimes she would ask her parents' permission to go. At times, Jamie would take friends with her. Tina never saw Dearing do anything that made her uncomfortable with Jamie going to his house. She stated that, after Jamie came home from Dearing's house, she never saw any indication that Jamie was in distress. Tina testified that she was aware that, some nights, when Jamie was at Dearing's house, Dearing's wife, Tracy, would leave the house to go play pool. At the time, she had no concerns about Jamie being alone with Dearing.

Jan, who at one time lived across the street from the Dearings, testified that she had known the Dearings her whole life. Because she had a troubled home life growing up, she spent a lot of time at the Dearings' home and considered them to be parent figures, although she "kept [her] distance" from Dearing due to what she experienced during her childhood. She testified that, in 1995, when she was thirteen, Dearing stuck his hand up her shirt and down her pants and touched her "private areas." She said that she saw him do the same to her cousin, Teri. She testified that Dearing once masturbated in the shower and had Teri and her watch him while

4

holding up a pornographic magazine. It scared her. She testified that the abuse happened more than twenty times, "pretty much every time" she was at Dearing's house. He would ask her about sexual encounters with her boyfriend, but she would change the subject because it made her uncomfortable. Dearing bribed her with wine coolers and cigarettes. He would also kiss her on the mouth, making her "a little uncomfortable." She told her mother about Dearing's behavior, but "[n]othing ever came of it." Jan remembered that it happened when Dearing lived in Nebraska and that his inappropriate behavior continued until she and her family moved to Colorado in 1996. She testified that in 1999, Dearing sent her an "inappropriate e-mail." He would send her other e-mails as well, but she never responded to them. Despite her claims about Dearing, she and her infant son moved in with the Dearings for "a short time" in 2004 or 2005.

Jan testified that Dearing and his wife at that time, Tracy, were foster parents during their time in Nebraska, but their foster license was revoked and their foster home was "shut down" because "there was a report that there [were] inappropriate actions . . . towards one of the foster children." Jan did not know what the inappropriate actions were, but Peggy Perkins, a friend of the Dearings and a foster parent herself, testified to her understanding that they lost their license because Dearing "was inappropriate to one of the foster girls. He . . . kissed one in the hallway [while] in his underwear." Dearing and his wife moved to Texas in 2006.

Jan moved to Texas in 2009 or 2010 and lived in a house across the street from Dearing. Her friend, Tina, lived across the street from her, next to Dearing's house. Jan remembered seeing Dearing looking at online photos of young girls with developing breasts. In 2010 or 2011, Jan remembered warning her friend Tina not to leave her children alone with Dearing.

When Dearing and his wife applied for a foster license in Texas, Jan opposed their effort, "filled out an application," and "made sure to put in [her] report . . . how [she] felt about it and what [she] went through when [she] was younger." She told the agency that she did not think the Dearings should get approved to provide foster care. When Texas's foster agency contacted her, Jan said, "[I]f you give [the Dearings] a foster care license, please watch those kids like no other."

Jan testified that, in 2013 or 2014, she briefly stayed with the Dearings to help Tracy recover from a back surgery. According to Jan, one night at around 2:00 a.m., she saw Jamie "come into the living room from where the bedrooms [were] . . . and . . . [sit] down on the couch." Jan found it very unusual, and when she asked the child if she was ok or in trouble, Jamie "just kind of shook her head a little bit." Then Dearing entered the room, his face flushed red, and he said he was going out to smoke a cigarette. Even though she nodded her head when asked if she was ok, the child "flushed red" in her face and looked like "[s]he was about to burst into tears." When Dearing came back into the house, he took Jamie back to the bedroom area of the house. Jan admitted that she never reported Dearing's behavior to law enforcement.

Although Jan never saw any inappropriate behavior, she was troubled by Dearing's behavior with two of his foster children, girls aged seven or eight. At times, he would show favoritism towards them. At other times, he would be stricter on them. The two children and their two siblings were eventually adopted by another family. On cross-examination, Jan admitted that, even though she never saw Dearing inappropriately touch either Jamie or the two foster children, she felt that any kind of touching by Dearing was inappropriate.

6

Perkins was a family friend of the Dearings and had known them since 1988. She was a foster parent for twenty-two years in Nebraska, where she lives. She got into fostering because of Dearing and Tracy. Perkins runs a therapeutic foster home for children with special needs. She testified that the Dearings' foster home was an emergency foster home, where they would have the children for less than thirty days.

Perkins saw Dearing interact with his children and foster children. Perkins testified that she saw Dearing kiss his niece Jan on the lips and that she saw him kiss two of the little foster girls on the lips. She found that odd, because Jan was his niece, but he did not know the foster children that well. She added that, as they were an emergency foster home, the Dearings were not going to develop a long-term relationship with the foster children. Perkins told Tracy about her concerns, but Tracy responded that that was "just the way [their] family [was]." Eventually, the two foster girls came to live at Perkins's foster home, and she was named guardian for them and raised them until they were nineteen years old.

Perkins testified that, one day, she went to Burger King and happened to see Teri, Jan's cousin, who was then sixteen or seventeen years old. She asked Teri if Dearing was "okay to [her]." Teri immediately broke down in tears. Perkins thought it best to just take her food and leave. After that, Perkins told the two foster children living with her that they were never to be alone with Dearing, and they devised a safety plan to employ if the girls ever felt unsafe.

Leo Herrera, an investigator with the Franklin County Sheriff's Office, testified that, on September 6, 2018, he received a report from Tina that her daughter had been sexually assaulted. After the child was interviewed at the CAC and further investigation was done, an arrest warrant

7

was issued for Dearing, who was arrested on March 21, 2019, for continuous sexual abuse of a child. Herrera's recorded interview of Dearing was admitted into evidence and played for the court. During the interview, Dearing denied the allegations against him and claimed that he could not have sex because of medical issues. Herrera admitted that he never took steps to verify whether Dearing was telling the truth and that there was no physical evidence indicating that Dearing was guilty.

Jenni Harwood testified that, in 2018, she was a forensic interviewer at the CAC and had conducted more than a thousand forensic interviews. In September 2018, she conducted a forensic interview of Jamie. Harwood testified that, during the interview, Jamie told her that Dearing had sexually abused her from the age of seven to the age of nine. The abuse would happen in Dearing's bedroom at her grandparents' house. Jamie said that Dearing would also come up behind her and grab her breasts, either on top of or under her clothes and that it made her feel uncomfortable.

Harwood testified that Jamie went into detail about different instances of abuse, occurring when she was seven, eight, and nine years old. Harwood testified:

> At the age of seven, she talked about that it was in his bedroom. He had antiques in his bedroom. They were on his bed. She started out sitting criss-crossed, and he pushed her back on the bed, and he took her clothes off, he took his clothes off, and she was lying on her back and his stomach was touching her stomach, and she stated that his penis went inside her vagina.

At the age of eight, "that [instance of abuse] also happened in [Dearing's] room as well. They were on the bed, and he took her clothes off, and he took his clothes off, and again, his penis went inside her vagina." Jamie told Harwood that, when she was nine years old, Dearing

8

raped her on his bed again, much like the previous times, but when she was nine, "something came out of his penis, and his penis went inside her vagina, and what came out of his penis went on the bed." When asked if she had any reason to doubt what Jamie told her, Harwood said no.

Dearing, who was sixty-four years old at the time of trial, testified that he had been married to Tracy for thirty-three years, that he was retired from the military, where he received an honorable discharge, and that, before this case, he had never been arrested or convicted of a crime. Dearing testified that, during his time as a foster parent, he had fostered about seventy children. He said that no one had ever "complained or made a complaint to the police" that he had sexually abused anyone.

He denied Jamie's allegations and specifically denied having sex with her. During his recorded police interview, Dearing claimed that, due to medication he was taking during the relevant time period, he was unable to have sex. At trial, however, he testified that he was able to achieve an erection at "any time." When asked if Jamie came to his house a lot, he answered "[n]ot a lot, no." He admitted that Tina and her husband Dean never liked him and that Tina did not get along with Tracy.

Dearing denied Jan's allegations and denied ever touching anyone in an inappropriate way. He believed that Jan said those things because of her troubled home life. He also denied ever kissing Jan, Teri, or any of his foster children on the lips. He believed Perkins was making up her allegations because she was "going through the death of her husband."

On cross-examination, the State asked Dearing about allegations made against him in Nebraska by one of his former foster children, June. He did not remember having a foster child

9

by that name. The State then asked if he remembered having a female foster child removed from his home in Nebraska because she accused him of kissing her. He responded, "No, I don't remember that. We never had any of them removed." The State then showed him State's Exhibit two, a "Child Abuse/Neglect Intake Worksheet" (the Worksheet), a document Dearing recognized as an "official government document" that was a "child abuse neglect document." According to the Worksheet, June claimed that Dearing had "kissed her and made inappropriate comments about her being of legal age," that he had been "buying her cigarettes," and that Dearing had sent her an e-mail "regarding [his] feelings." The document also said that June had "been removed from the Dearings and [would] not be going back."

At the conclusion of the guilt/innocence phase of the trial, the court found Dearing guilty as charged. After a hearing on punishment, the trial court sentenced Dearing to life in prison. Dearing appeals.

All of Dearing's arguments on appeal criticize the performance of his trial attorney. As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). To prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). *See Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009) (orig. proceeding). A failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

10

To prove ineffective assistance of counsel, a defendant must show that (1) trial "counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, based on prevailing professional norms, and (2) "there is a reasonable probability that . . . the result of the proceeding would have been different" but for trial counsel's deficient performance, *Strickland*, 466 U.S. at 694. *See Hernandez v. State*, 726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986) (applying *Strickland* test to review of claim of ineffective assistance of counsel under Texas statutes and constitutional provisions). Under *Strickland*, first, the defendant "must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act or omission." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). Second, the defendant must demonstrate prejudice from the attorney's performance. That is, considering the totality of the evidence before the judge or jury, "there is a reasonable probability[2] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 696. Thus, a defendant must show "that counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result was reliable." *Id.* at 687. It is not sufficient for the defendant to show "that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.

"Judicial scrutiny of counsel's performance must be highly deferential," and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 99 (1955)). We apply a strong presumption that trial counsel was competent and presume

_____

[2]"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

11

that counsel's actions and decisions were reasonably professional and motivated by sound trial strategy. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson v. State*, 9 S.W.3d 808, 812–14 (Tex. Crim. App. 1999). "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (quoting *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001)). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813).

*(1)     Not Cross-Examining the Victim Thoroughly Regarding the Details and Circumstances of the Abuse*

Dearing contends that Jamie's testimony was "rote and devoid of any of the detail that would distinguish true memories from fabricated falsehoods" and that, because of that, his counsel was ineffective for failing to inquire as to the details and circumstances of the abuse.[3] Specifically, Dearing argues that his counsel was ineffective for not asking questions like the following:

> [W]hat was the Appellant wearing when this happened, what was the complainant wearing, and how was he able to so easily remove all of their clothing without arousing suspicion or risking discovery? What was the complainant doing immediately before these events, how was Appellant able to get her alone in his bedroom, and what did he tell her to explain the very obviously abnormal behavior they were engaging in? Why did he tell her [that] she "acted better" than the other girls? What made him threaten to harm her family? Perhaps

[3]Dearing fails to cite to any caselaw in support of this argument.

12

counsel might try a more direct and probing inquiry into the abuse itself: how did Appellant's penis look? How did it make her feel? How did he treat her: was he gentle, was he rough? What did he use: lubricant, protection?

"Cross-examination is inherently risky, and a decision not to cross-examine a witness is often the result of wisdom acquired by experience in the combat of trial." *Ex parte McFarland*, 163 S.W.3d 743, 756 (Tex. Crim. App. 2005) (orig. proceeding) (citing *Coble v. State*, 501 S.W.2d 344, 346 (Tex. Crim. App. 1973)). "Furthermore, cross-examination is an art, not a science, and it cannot be adequately judged in hindsight." *Id.* If unsuccessful, "cross-examination can serve to bolster the credibility of the witness and underscore the very points that are sought to be impeached." *Jones v. State*, 500 S.W.3d 106, 115 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting *Dannhaus v. State*, 928 S.W.2d 81, 88 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd)).

Here, Dearing did not move for a new trial on the basis of ineffective assistance of counsel and did not afford his trial counsel an opportunity to explain himself. Without more, we cannot evaluate whether counsel had a reasonable reason for not cross-examining Jamie more vigorously about the details of the abuse. *See Darkins v. State*, 430 S.W.3d 559, 571 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) ("The record does not reflect counsel's strategy for [the defendant's] testimony . . . .").

Commonly, trial counsel for the accused asks relatively few questions of an alleged child victim of sexual abuse. Here, counsel could have been afraid that Jamie's answers could strengthen her testimony, garner unwarranted sympathy for her, or otherwise strengthen the State's case. Because there is a plausible professional reason for counsels' actions, this argument

13

fails to satisfy the first prong of *Strickland*. *See Bone*, 77 S.W.3d at 836. We overrule this point of error.

*(2)    Not Objecting to the Forensic Interviewer Testifying as an Outcry Witness*

Dearing asserts that his counsel was ineffective because he failed to develop a record and challenge the basis for allowing Harwood as an outcry witness.

The State listed Harwood as a potential outcry witness and elicited testimony from her about Jamie's out-of-court allegations of abuse. Article 38.072 of the Texas Code of Criminal Procedure permits the introduction of hearsay testimony relating to the statement of a child to the first person over the age of eighteen years describing with detail the abuse for which a defendant is on trial. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 1(1), § 2(a), (b) (Supp.). The testimony of an outcry witness is a statutory exception to the hearsay rule. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(b).

Here, Jamie testified that the first person she had told about the abuse was her friend, whose age the record does not reveal. At the friend's urging, Jamie told her mother, Tina. The next person Jamie told about the abuse was Harwood, who conducted the CAC forensic interview of Jamie. At trial, only Harwood testified as an outcry witness. Dearing contends that his counsel was ineffective for not developing a record and challenging the State's use of Harwood as an outcry witness.

The ineffectiveness of counsel is a matter that must be firmly founded in the record, but here the record does not support Dearing's arguments. *See Smith v. State*, 51 S.W.3d 806, 812 (Tex. App.—Texarkana 2001, no pet.). The record is silent as to why Dearing's trial counsel

14

failed to develop a record and challenge the State's use of Harwood as an outcry witness. Dearing could have preferred Harwood's more clinical testimony to the possibly emotional and sympathy-inducing outcry testimony of Tina. *See Lopez v. State*, 343 S.W.3d 137, 143–44 (Tex. Crim. App. 2011) ("The record is silent as to why trial counsel failed to object to the outcry-witness testimony. . . . [A]ppellant did not produce additional information about trial counsel's reasons for allowing all three outcry witnesses to give similar testimony about the same event or for allowing opinion testimony about the credibility of the complainant, both without objection."). A motion for new trial was not filed in this case, and no post-trial hearings were conducted. We thus have no record to explain why trial counsel conducted the trial as he did. When an appellate record is silent on why trial counsel failed to take certain actions, the appellant has "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable." *Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007); *see Thompson*, 9 S.W.3d at 814. We overrule this point of error.

*(3)     Not Objecting to the Forensic Interviewer's Testimony as to the Victim's Veracity*

On direct examination, the State asked Harwood if she had any reason to doubt Jamie when she had told about the abuse. Harwood replied, without objection, "No I did not. I do not." Dearing contends that his counsel was ineffective because he failed to object to Harwood's testimony as to Jamie's veracity.

"Virtually every jurisdiction which has addressed, in the context of a child sexual assault case, the admissibility of direct testimony as to the truthfulness of the child complainant, has held that such direct testimony is inadmissible." *Yount v. State*, 872 S.W.2d 706, 711 n.8 (Tex.

15

Crim. App. 1993) (citations omitted). Testimony may be offered to support the credibility of a witness in the form of opinion or reputation, but the evidence may refer only to "the witness's reputation for having a character for truthfulness or untruthfulness." TEX. R. EVID. 608(a). A lay witness may not, under Rule 608, testify to the complainant's truthfulness as to the particular allegations. *See Schutz v. State*, 957 S.W.2d 52, 72 (Tex. Crim. App. 1997). Further, evidence of truthful character may only be offered "after the witness's character for truthfulness has been attacked." TEX. R. EVID. 608(a).

The facts of this case are similar to those of *Macias v. State*, where the CAC forensic interviewer testified, without objection, that the child complainant was "a credible little girl" and that the child was "credible in what she was telling [the interviewer]." *Macias v. State*, 539 S.W.3d 410, 416–17 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd). Even though the testimony was inadmissible, the court of appeals held, "In the absence of evidence concerning trial counsel's reasons for failing to object to this opinion testimony . . . [the] appellant has failed to meet his burden under *Strickland* to show . . . that his trial counsel rendered deficient performance." *Id.* at 417.

Here, as in *Macias*, because the record is silent, we must presume counsel had a plausible reason for not objecting to the testimony. *See Johnson v. State*, 432 S.W.3d 552, 557 (Tex. App.—Texarkana 2014, pet. ref'd). Counsel could have reasonably concluded that an objection would have served only to emphasize the testimony. *See Alberts v. State*, 302 S.W.3d 495, 506 n.7 (Tex. App.—Texarkana 2009, no pet.). Because Dearing's claim of ineffective assistance of

16

counsel is not firmly founded in the record, we conclude that he has failed to show that his counsel rendered deficient performance. Accordingly, we overrule this point of error.

*(4)      Not Objecting to the State's Improper Impeachment of Dearing*

Jan was asked if she knew why the Dearings' foster home was shut down, and she said, in part, "There was a report that there [were] inappropriate actions. I don't know what those actions were, but it was inappropriate actions towards one of the foster children that caused them to have their license revoked from the foster care agency." In part of his fourth point of error, Dearing contends that his trial counsel was ineffective because he failed to object to that portion of Jan's testimony.

Plausible professional reasons exist for not objecting to Jan's testimony. For instance, Dearing's counsel could have refrained from objecting so as not to draw attention to her reply because, after all, she admitted that she had no personal knowledge of the "inappropriate actions." There may have been strategic reasons for not objecting in these instances, but we may not speculate on counsel's motives in the face of a silent record. *See Thompson*, 9 S.W.3d at 814; *see also Gamble v. State*, 916 S.W.2d 92, 93 (Tex. App.—Houston [1st Dist.] 1996, no pet.) (declining to speculate on various failures to object to admission of evidence). We cannot say that defense counsel's conduct was "so outrageous that no competent attorney would have engaged in it." *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). Therefore, we conclude that appellant has not satisfied the first prong of *Strickland*. We overrule this point of error.

17

*(5)     Not Objecting to the Admission of the Worksheet*

Dearing also contends that his trial counsel was ineffective because he failed to object to the admission and use of the Worksheet.

The two prongs of *Strickland* need not be analyzed in a particular order, and here, we turn first to the prejudice prong. *See Strickland*, 466 U.S. at 697. We must determine whether, in the context of the overall record, Dearing has shown by a preponderance of the evidence that his counsel's deficiency so compromised the proper functioning of the adversarial process that the trial court cannot be said to have produced a reliable result. *Id.* at 686.

Here, even if the Worksheet had not been admitted or used by the State, the remaining evidence against Dearing, in its totality, is strong and would support a finding by the court that Dearing committed the offense of continuous sexual abuse of a child. Jamie's testimony was strong, visceral, and compelling. Jamie's accounts of the three different sexual assaults were recounted in more detail by Harwood, the CAC interviewer.

Jan testified that Dearing would kiss her on the mouth, making her uncomfortable, and that he once masturbated in front of her and her cousin Teri. Portions of Jan's testimony tended to corroborate Jamie's testimony. Like Jamie, Jan testified that, in 1995, when she and Teri were children, Dearing would often stick his hand up her shirt and grab her breasts or put his hand down her pants and touch her "private areas." As mentioned above, Jan also described the suspicion-arousing incident in the Dearing house when Jamie and Dearing came from the bedroom area into the living room around 2:00 a.m.

18

While Dearing denied the allegations of Jamie and Jan and denied ever kissing any of the children on the lips, he gave conflicting testimony as to whether he was physically able to have sex.

In the Worksheet, June alleged that Dearing kissed her on the lips and bribed her with cigarettes, but Jan testified that Dearing did the same thing with her, so similar evidence was already in the record. Introducing the Worksheet evidence took very little time, the evidence was a small percentage of the total evidence introduced at trial, and the allegations in the Worksheet were not emphasized by the State in its closing argument.

We find that Dearing has failed to show a reasonable probability that the result of the trial would have been different but for counsel's failure to object to the Worksheet. Based on the foregoing, we conclude that Dearing has failed to satisfy the prejudice prong of *Strickland*. Accordingly, we overrule this point of error.

*(6)    Not Objecting to the State's Argument Outside the Record*

Finally, Dearing contends that his counsel was ineffective for failing to object to the following closing argument made by the State during the punishment phase:

> While [Dearing's counsel] makes an argument that[, due to Dearing's health issues,] 25 years is a life sentence for [Dearing], what I'm concerned about is the word "life." Because we have not only [Jamie], we have [Jan], and we have [June] . . . and *we have all of the foster children that weren't even brought into this case that he has probably victimized*, *that we cannot get that information because he knows who to pick to be his victims.*

(Emphasis added). Assuming that the argument was improper and that Dearing's trial counsel was deficient for failing to object to it, Dearing has not shown prejudice.

19

"[I]t has been uniformly held that when the trial is before the court it will be presumed that [the court] did not consider improper argument." *Juarez v. State*, 439 S.W.2d 346, 347 (Tex. Crim. App. 1969).

When sentencing Dearing to life in prison, the trial court acknowledged Dearing's argument that, due to his health problems, the minimum sentence of twenty-five years in prison was essentially a life sentence. The trial court made no reference to the State's argument, and there is no indication that the trial court considered it. Thus, Dearing has failed to rebut the presumption that the trial court disregarded the State's improper argument. If the trial court did not consider the argument, then Dearing cannot show a reasonable probability that, but for his counsel's failure to object to this argument, the outcome of the punishment hearing would have been different, thereby failing to satisfy the second prong of *Strickland*. *See Strickland*, 466 U.S. at 694. Accordingly, we overrule this point of error.[4]

---

[4]Dearing also argues that cumulative harm resulted from the above-mentioned complaints of ineffective assistance. The concept of cumulative error has been extended to ineffective assistance of counsel claims. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (citing *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988)). However, there is "no authority holding that non-errors may in their cumulative effect cause error." *Bryant v. State*, 282 S.W.3d 156, 176 (Tex. App.—Texarkana 2009, pet. ref'd) (quoting *Chamberlain*, 998 S.W.2d at 238). Because we have determined that his individual claims lack merit, there can be no cumulative error. *See Gamboa v. State*, 296 S.W.3d 574, 585 (Tex. Crim. App. 2009).

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:     July 18, 2022
Date Decided:       September 13, 2022

Do Not Publish